**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| F21 OPCO, LLC, *et al.*,[1] | Case No. 25-10469 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF STEPHEN COULOMBE IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Stephen Coulombe, declare under penalty of perjury:

1.      I am the Co-Chief Restructuring Officer (the "**Co-CRO**")[2] of F21 OpCo, LLC, a Delaware limited liability company, and each of the other above-captioned debtors and debtors in possession (collectively, "**Forever 21**," the "**Debtors**," or the "**Company**").  On the date hereof (the "**Petition Date**"), the Debtors commenced voluntary cases (these "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

2.      As the Co-CRO of the Debtors, I am responsible for, and am materially engaged with, the Debtors' operational and financial management including with respect to, among other things: (a) all restructuring activities and initiatives of the Company; (b) cash management and liquidity forecasting; (c) the development of, or revisions to, the Company's business plan, including assistance with the going concern and store closing sale processes

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: F21 OpCo, LLC (8773); F21 Puerto Rico, LLC (5906); and F21 GiftCo Management, LLC (6412).  The Debtors' address for purposes of service in these Chapter 11 Cases is 110 East 9th Street, Suite A500, Los Angeles, CA 90079.

[2]    Michael Brown of Berkeley Research Group, LLC was appointed as the other Co-Chief Restructuring Officer of the Company on or about January 16, 2025, the same day on which I was appointed.

described herein; (d) engagement with creditors and other stakeholders; (e) formulation and negotiation of the contemplated plan of liquidation, described herein; and (f) overall contingency planning.

3.      I am a Managing Director at Berkeley Research Group, LLC ("**BRG**"), a professional services firm with offices located at 99 High Street, 27th Floor, Boston, Massachusetts 02110.  I have more than 25 years of experience serving as a financial advisor and providing restructuring and performance improvement services to corporations, various creditor classes, equity owners, and directors of underperforming companies, including a significant number of large retailers with substantial national and international presences.  I have previously served as, among other positions: Co-Chief Restructuring Officer of Independent Pet Partners, LLC; Chief Restructuring Officer of Gymboree Group, Inc.; Chief Restructuring Officer of Quiksilver, Inc.; Chief Restructuring Officer of Sports Authority Holdings, Inc.; and Chief Financial Officer of rue21 Inc.  Prior to joining BRG in May 2016, I was a Senior Managing Director at FTI Consulting, Inc., where I served in similar capacities on behalf of distressed companies.  BRG has provided financial advisory and senior management services in some of the largest chapter 11 cases, including many in the retail sector, filed in this District and elsewhere, including Neiman Marcus, Radio Shack, Stage Stores and American Apparel, among others.

4.      Except as otherwise indicated, I base all facts set forth in this declaration (this "**Declaration**") on my personal knowledge, my review of business records, or my opinion based on my experience, knowledge, and information concerning the Debtors' operational and financial condition.  If called to testify, I would testify competently to the facts set forth in this Declaration, which I am authorized to submit on the Debtors' behalf.

5.       I submit this Declaration to describe the Debtors' background, the circumstances that led to these Chapter 11 Cases and the Debtors' proposed use of chapter 11 to maximize the value of their estates, and to provide evidentiary support for the relief requested by the Debtors in the "first day" motions and applications filed with the Court (collectively, the "**First Day Pleadings**"), which are discussed in more detail herein.

## INTRODUCTION[3]

6.       The Debtors sell trendy clothing and accessories to customers in the United States primarily at brick-and-mortar stores.   As of the Petition Date, the Debtors operate approximately 354 leased stores in the United States, including locations at some of the most desirable shopping malls in the country.[4]  Forever 21 also sells merchandise through its website— www.forever21.com—that the Company has hosted since the early 2000s.  Pursuant to a license agreement with a subsidiary of Authentic Brands Group ("**ABG**"), the Debtors license the Forever 21 brand for certain product categories and uses within the U.S.[5]

7.       As discussed more fully herein, the Debtors' corporate structure and business operations relate back to the 2019 chapter 11 proceeding in this District (the "**2019 Bankruptcy**") commenced by the Company's predecessor, Forever 21, Inc. ("**Old F21**"), and certain of its then-affiliates.  As a result of the 2019 Bankruptcy, the Company continued as a strengthened going concern after obtaining a significant investment from its ownership and access to substantial additional financing sources.  The Company was also able to reduce expenses as a result of strategically exiting unprofitable stores during the 2019 Bankruptcy.

---

[3]     Capitalized terms used but not defined in this section have the meanings ascribed to them later in this Declaration.

[4]     These calculations reflect the closure of approximately thirty-four stores in the year prior to the Petition Date.

[5]     The Forever 21 brand is separately licensed by ABG to third parties around the world.

8. As people returned to in-person shopping once the COVID-19 pandemic eased, the Debtors were initially successful and had positive EBITDA, as further detailed below. But the historic rise in inflation rates beginning in 2021 led to a significant increase in the Debtors' cost of doing business, including the cost of inventory, distribution, transportation, and employee wages. These inflationary pressures and changing consumer preferences were not only issues that the Debtors had to confront. Specifically, the Debtors compete in a highly competitive retail environment with both other brick-and-mortar retailers in malls and shopping districts as well as online competitors. The Debtors' business has been materially and negatively impacted by the ability for online retailers to take advantage of the "de minimis exemption" which exempts goods valued under $800 from import duties and tariffs. Certain non-U.S. online retailers that compete with the Debtors, such as Temu and Shein, have taken advantage of this exemption and, therefore, have been able to pass significant savings onto consumers. Consequently, retailers that must pay duties and tariffs to purchase product for their stores and warehouses in the United States, such as the Company, have been undercut. Despite wide-spread calls from U.S. companies and industry groups for the U.S. government to create a level playing field for U.S. retailers by closing the exemption, U.S. laws and policies have not solved the problem. SPARC (defined below) attempted to counteract these operational challenges by partnering with Shein in 2023 and seeking relief from the exemption (or a closure of the exemption), but these efforts have not resulted in any changes to the exemption nor stemmed the Company's losses. The ability for non-U.S. retailers to sell their products at drastically lower prices to U.S. consumers has significantly impacted the Company's ability to retain its traditional core customer base.

9. Over the last year, the Debtors' management team has been focused on implementing cost-saving operational measures to improve Company performance and curtail

32822667.17

losses, including renegotiating store leases and license fees, yielding over $50 million in savings for the Company.  Unfortunately, these strategic initiatives have been insufficient to counteract the Company's declining performance and significant losses.

10.     The Debtors and their parent company have, therefore, explored all available strategic alternatives, including a sale of the Debtors' assets or equity, as well as winding down the Company's operations.  To ensure that the Debtors maximize the value of their assets for the benefit of all stakeholders, the Debtors implemented governance changes in January 2025 and formed a new independent board of managers comprised of Mssrs. Paul Aronzon and Scott Vogel (together, the "**Board**").  After considering their options, the Debtors, at the direction of the Board, commenced store closings at a significant number of their stores starting on February 14, 2025, which process continued for all remaining stores no later February 28, 2025.

11.     The Debtors initiated these Chapter 11 Cases to maximize value for this orderly and efficient liquidation at each of their brick-and-mortar retail locations in the United States (such sales, the "**Store Closing Sales**").  At the same time, the Debtors have continued to market their business to third parties that may be interested in purchasing all or a subset of the Company or its assets on a going concern basis (such marketing and sale process, the "**Going Concern Sale Process**"), a process that the Debtors will continue postpetition.  If there is an actionable going concern proposal that warrants stopping ongoing Store closing Sales, the Debtors will exercise their business judgment and determine the appropriate course of action.

12.     The Debtors also intend to present and prosecute a chapter 11 liquidating plan (the "**Plan**") at the outset of these Chapter 11 Cases.[6]  The Plan, which has the support of the

---

[6]     The Debtors and their secured lenders have agreed to certain case milestones in connection with the consensual use of cash collateral described below, including with respect to the Plan, which will be filed no later than ten days after the Petition Date.

Debtors' secured lenders through a plan support agreement (the "**PSA**"), provides a framework for distributing all available proceeds of the Debtors' assets in accordance with the priority scheme set forth in the Bankruptcy Code, subject to agreements reached with the Debtors' largest stakeholders.  The Debtors' proposed process will ensure the timely and efficient wind down of their estates and bring finality to their Chapter 11 Cases and their stakeholders in the near term. To execute on their proposed path forward, the Debtors reached agreement with their secured lenders on the consensual use of cash collateral, including with respect to a budget that provides for sufficient cash to pay the reasonably anticipated administrative costs of these Chapter 11 Cases.

13.     The remainder of this Declaration is divided into six parts.  Part I describes the Debtors' corporate history, business operations, organizational structure, and the 2019 Bankruptcy.  Part II describes the Company's prepetition capital and debt structure.  Part III describes the circumstances leading to the commencement of these Chapter 11 Cases.  Part IV describes the Investigation (as defined below).  Part V describes the proposed terms for postpetition consensual use of cash collateral and the contemplated Plan.  And Part VI provides evidentiary support for the First Day Pleadings and certain other documents filed with the Court.

## I.     DESCRIPTION OF THE DEBTORS

### A.     History of the Debtors' Business and the 2019 Bankruptcy

14.     Forever 21 was founded in 1984 and has since been a leader in the "fast fashion" industry.  The Company began as a 900 square foot store in California, but through the 1980s and 1990s, expanded throughout the United States and, eventually, globally.  At its peak, Forever 21 employed 43,000 people, had over $4 billion in annual sales, and operated internationally under franchise arrangements entered into with foreign partners.

15.     The Debtors have had a fiercely loyal customer base, consisting primarily of young people seeking affordable means of self-expression through fashion.  Since its inception,

Forever 21 has stocked its stores with vibrant clothing, jewelry, handbags, eyewear, scarves, shoes, and thousands of accessories grouped together across a range of styles to fit any occasion, allowing young people to express their fashion sense through trendy but affordable clothing and accessories. Forever 21 has license or other partnership arrangements with some of the biggest and most recognizable brands in retail and has been at the center of pop culture for decades.

16.     In 2019, after confronting significant financial distress on the heels of an aggressive foreign expansion campaign, the Debtors' predecessor, Old F21 and certain of its then-affiliates commenced the 2019 Bankruptcy, in jointly administered cases captioned *In re Forever 21, Inc., et al.*, Case No. 19-12122 (MFW).   Old F21 used the 2019 Bankruptcy to work collaboratively with its major stakeholders, including landlords and trade vendors, to maintain Old F21's business while also reducing its domestic and international footprint and shedding many burdensome obligations.   Through the 2019 Bankruptcy, Old F21 implemented a Court-supervised marketing and sales process in hope of finding a viable buyer for Old F21's assets.

17.     Old F21 was able to successfully consummate a going-concern sale during the 2019 Bankruptcy.   Specifically, a joint venture formed with Old F21's largest landlords, Simon Property Group (together, with any affiliates or subsidiaries, "**Simon**") and Brookfield Property Partners (together, with any affiliates or subsidiaries, "**Brookfield**"), on the one hand, and ABG, on the other, purchased Old F21's business pursuant to a Court-approved going-concern sale transaction in February 2020 (the "**F21 Acquisition**").   One year later, Brookfield sold its interest in F21 Opco, LLC to SPARC Group Holdings LLC ("**SPARC**").   SPARC's primary equity holders, Simon and ABG, are leaders in their respective fields.   Simon, an S&P 100 company, is a real estate investment trust engaged in the ownership of premier shopping, dining, entertainment,

and mixed-use destinations.  ABG, in turn, is a brand licensing and development, marketing, and entertainment company that owns a portfolio of global media, entertainment, and lifestyle brands.

18.     The F21 Acquisition preserved thousands of jobs and vendor and landlord relationships, and kept a significant number of stores occupied, all, as it turned out, on the eve of the COVID-19 pandemic.  While Old F21's operational assets now reside with Debtor F21 OpCo, LLC (*i.e.*, accounts receivable, inventory, leasehold interests, etc.), Old F21's intellectual property now resides with a subsidiary of ABG, which currently licenses the Forever 21 brand to the Debtors for their domestic operations and to third parties that operate under the Forever 21 brand internationally.  For the avoidance of doubt, parties doing business under the Forever 21 brand internationally are not involved in these Chapter 11 Cases.

### B.     The Debtors' Business Operations After the 2019 Bankruptcy

#### a.     *The F21 Acquisition*

19.     The Debtors continued their predecessors' business in the United States following the F21 Acquisition, which, among other things, allowed the Company to take advantage of valuable synergies that SPARC had developed in the retail industry.  Specifically, by utilizing the vast retail experience possessed by ABG and Simon, SPARC had become, and remains at this time, a leader in the operations of fashion and apparel companies through the operation of well-known and successful brands such as Aéropostale, Brooks Brothers, Eddie Bauer, Nautica, and Lucky Brands.

20.     The Debtors enjoyed a moderate period of success after the F21 Acquisition, especially after customers returned to pre-pandemic shopping habits on an incremental basis.  Specifically, the Company generated approximately $2 billion in revenue and $165 million in EBITDA in fiscal year 2021.  Since fiscal year 2021, however, the Company's

performance has suffered significantly due to inflation, the de minimis exemption, and certain other factors.

21.     The Debtors have also continued to operate the Forever21.com website, selling clothes to customers throughout the U.S.  In 2024, approximately 11% of the Debtors' domestic sales were originated online.

   b.     *Historical Cash Management*

22.     After the F21 Acquisition, the Debtors participated in a cash pooling system that SPARC had developed for the collection of brands it operates.  Centered at SPARC Group LLC, the entity housing the Aeropostale brand's operations ("**Aero**"), all cash generated by entities under the SPARC umbrella, including the Debtors, was swept into an account held by Aero (such arrangement, the "**Cash Pooling Arrangement**"), which Aero then used to pay down the Old SPARC ABL Facility (as defined below).  As the Debtors or other SPARC subsidiaries required cash to fund their respective operations, Aero would draw on the Old SPARC ABL Facility and disburse funds to the applicable SPARC portfolio company (generally on a brand-by-brand basis); an intercompany receivable owing from such entity was recorded and, simultaneously, the applicable SPARC subsidiary would book an intercompany payable owing to Aero.  This arrangement continued after the Old SPARC ABL Facility was replaced with the ABL Facility (as defined below) in connection with the SPARC Acquisition (as defined below).  As of the Petition Date, the intercompany payable owing from the Debtors to Aero pursuant to the Cash Pooling Arrangement is approximately $320 million (the "**SPARC Payable**").

   c.     *The Company's Vendor and Landlord Relationships*

23.     The Debtors rely on a comprehensive network of primarily foreign vendors for manufacturing and production of their merchandise.  The Company has, in the last five years, worked with well over 1,000 vendors and suppliers to manufacture and deliver merchandise to

customers in the United States and internationally.  Generally, the Company has worked with various domestic vendors to design and source merchandise from foreign manufacturers, located predominantly in China, Korea, and Hong Kong.

24.      After consummation of the F21 Acquisition, the Company operated approximately 413 Forever 21 stores in the United States, but did not own any of its own real property.  Recognizing the consumer shift away from shopping at brick-and-mortar stores and the significant burden of Forever 21's leasehold expenses, the Company attempted to further shed underperforming leases throughout 2024.

25.      As of the Petition Date, the Debtors lease retail space from approximately 78 unique landlords nationwide, with approximately 27% of their operating retail locations leased from Simon and 19% from Brookfield.  Of the Debtors' open stores as of the Petition Date, approximately 123 are located in shopping malls, 55 in outlet centers, and the balance in cities and suburban shopping areas with strong foot traffic and surrounding retail operations.  Approximately 75% of the Debtors' leases determine the Company's rental obligations based on a calculation of such location's prior month's revenue, rather than on a flat rate basis.  The percentage rent owed to applicable landlords depends on many factors, including but not limited to the productivity of the real estate, the supply and demand dynamics for space, geographic location, store square footage, and other considerations.

26.      The Debtors also lease a corporate headquarters in Los Angeles, California, which the Debtors have occupied since June 2022, and lease and operate a 656,000 square foot distribution center in Perris, California (the "**Distribution Center**"), which houses certain valuable machinery and equipment, as well as the Debtors' merchandise and inventory.[7]

---

[7]   The Debtors utilize a third-party logistics provider, Maersk, to provide labor at the Distribution Center, which is
     leased for approximately $500,000 per month under a lease (the "**Distribution Center Lease**") set to expire in

27.     As of the Petition Date, the Debtors are current on their rental obligations other than rent which came due and owing to landlords between March 1, 2025, and the Petition Date.

**C.    JC Penney Acquires SPARC**

28.     On December 19, 2024, JC Penney, an iconic American shopping destination offering a broad portfolio of fashion, apparel, home, beauty, and jewelry from national and private brands, acquired SPARC, thereby forming a new company known as Catalyst Brands (hereinafter, "**Catalyst Brands**," and such acquisition, the "**SPARC Acquisition**").  In connection with the SPARC Acquisition, among other things, all equity interests in SPARC were acquired by Copper Retail JV, LLC, the parent company of the JC Penney business.  The SPARC Acquisition brought together the operations for six unique brands, and Catalyst Brands launched with 1,800 store locations and 60,000 employees.   As part of the SPARC Acquisition, the former owner of SPARC, SPARC Group Holdings II LLC (equity in which is held by affiliates of Simon, ABG, and global e-commerce platform Shein) became a minority owner in Catalyst Brands.  As of the SPARC Acquisition, affiliates of Simon, ABG, and Brookfield all hold equity in Catalyst Brands.

29.     In connection with the SPARC Acquisition, Catalyst Brands also stated publicly that it was exploring strategic options for the Company.

**II.    CAPITAL STRUCTURE AND PREPETITION DEBT**

30.     The Debtors' organizational structure remained the same after the SPARC Acquisition.  Debtor F21 OpCo, LLC is the primary operating Debtor; Debtor F21 Puerto Rico, LLC operates the Debtors' five stores in Puerto Rico; and Debtor F21 GiftCo Management, LLC is the entity which administers the Debtors' gift card program, discussed below.  A copy of the

---

2029.  The Debtors have been actively marketing the Distribution Center Lease given the advantageous location and Distribution Center capacity.

organizational chart of F21 Opco, LLC and its direct and indirect subsidiaries, which includes the three Debtors, is attached hereto as **Exhibit A** (the "**Corporate Organization Chart**").  A copy of an organizational chart setting forth the Debtors and their non-Debtor affiliates within the broader Catalyst Brands enterprise is attached hereto as **Exhibit B**.

   A.   **Prepetition Debt Structure**

      a.   *Pre-SPARC Acquisition Debt Structure*

   31.   Prior to the SPARC Acquisition, SPARC and certain of its direct and indirect subsidiaries, including the Debtors, were party to: (a) that certain Third Amended and Restated Credit Agreement, dated as of March 1, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Old SPARC ABL Credit Agreement**"), entered into with PNC Bank National Association, as administrative agent and collateral agent, and the lenders party thereto that provided an asset-backed facility (the "**Old SPARC ABL Facility**"); (b) that certain Credit Agreement, dated as of July 10, 2023 (as amended, restated, amended and restated, supplemented and otherwise modified from time to time, the "**Old SPARC LC Term Loan Agreement**"), by and among SPARC Group LLC, PNC Bank, National Association, as administrative agent, and each lender from time to time party thereto, that provided a term loan backed by letter of credit (the "**Old SPARC LC Term Loan Facility**"); and (c) the initial Subordinated Loan Credit Agreement (as defined below) originally entered into in February 2024 to provide intercompany loans for the benefit of direct and indirect subsidiaries of SPARC.

   32.   In connection with the SPARC Acquisition, among other things, (a) the Old SPARC ABL Facility and Old SPARC LC Term Loan Facility were repaid and refinanced, all commitments to the lenders thereunder were terminated, and all related loan documents, guarantees, liens, and other obligations thereunder were terminated and released, (b) SPARC and certain of its direct and indirect subsidiaries, including the Debtors, became joining loan parties to

JC Penney's existing debt facilities, *i.e.*, the ABL Facility and the Term Loan Facility (as defined below), and (c) certain JC Penney entities that are ABL Loan Parties and Term Loan Parties (each as defined below) became obligors under the Subordinated Loan Facility.

b.    *Post-SPARC Acquisition Debt Structure*

33.    As of the Petition Date, the Debtors are obligors under the ABL Credit Agreement, Term Loan Credit Agreement, and Subordinated Loan Credit Agreement (each as defined below).  The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

| Funded Debt | Maturity | Approximate Outstanding Principal Amount as of the Petition Date |
|---|---|---|
| ABL Facility | December 2026 | $1.085 billion |
| Term Loan Facility | December 2026 | $321 million |
| Subordinated Loan Facility | May 2027 | $176 million |
| **Total Funded Debt** | | $1.582 billion |

(1)    ABL Facility

34.    Pursuant to that certain Joinder and Third Amendment to Credit Agreement, dated as of December 6, 2024, the Debtors became ABL Loan Parties under that certain Credit Agreement, originally dated as of December 7, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "**ABL Credit Agreement**," and, collectively with the Loan Documents (as defined in the ABL Credit Agreement), the "**ABL Loan Documents**"), by and among (a) Penney Holdings LLC, as lead administrative borrower, and certain other Loan Parties (as defined in the ABL Credit Agreement), including non-Debtor affiliates (together with Penney Holdings LLC, collectively, the "**ABL Loan Parties**"), (b) Wells Fargo Bank, N.A., in its capacity as administrative agent, and Wells Fargo

Bank, N.A. and PNC Bank, N.A., as co-collateral agents (collectively, in such capacities, the "**ABL Agent**"), and (c) the lenders party thereto from time to time (collectively, the "**ABL Lenders**").  The ABL Loan Documents provide for a revolving facility of up to $1.75 billion (the "**Revolving Facility**") and a first-in, last out facility of $160 million (the "**FILO Facility**," and together with the Revolving Facility, the "**ABL Facility**"), in each case subject to certain adjustments to the applicable borrowing base as described in the ABL Credit Agreement.

35.     The maturity date on the ABL Facility is December 16, 2026.  The obligations under the ABL Loan Documents are secured by liens on, and security interests in, substantially all assets of the ABL Loan Parties, subject to certain exceptions (the "**Prepetition Collateral**," and the liens attaching to such ABL Collateral, the "**ABL Liens**").

36.     As of the Petition Date, approximately $1.085 billion in aggregate principal amount is outstanding under the ABL Facility, consisting of approximately $925 million in principal amount outstanding under the Revolving Facility and approximately $160 million in principal amount outstanding under the FILO Facility.  The ABL Lenders have full recourse rights against the Company with respect to these obligations.

(2)     Term Loan Facility

37.     Pursuant to that certain Joinder and Third Amendment to Credit Agreement, dated as of December 6, 2024, the Debtors became Term Loan Parties (as defined below) under that certain Credit Agreement, originally dated as of December 7, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "**Term Loan Credit Agreement**," and, collectively with the Loan Documents (as defined in the Term Loan Credit Agreement), the "**Term Loan Documents**"), by and among (a) Penney Holdings LLC, as lead administrative borrower, and the other Loan Parties (as defined in the Term

Loan Credit Agreement), including non-Debtor affiliates (together with Penney Holdings LLC, collectively, the "**Term Loan Parties**"), (b) Pathlight Capital LP, in its capacity as administrative agent and collateral agent (in such capacity, the "**Term Loan Agent**"), and (c) the lenders from time to time party thereto (collectively, the "**Term Loan Lenders**").  The Term Loan Documents provide for a first in, last-out term loan credit facility of up to $340 million (the "**Term Loan Facility**").

38.     The maturity date on the Term Loan Facility is December 16, 2026. The obligations under the Term Loan Documents are secured by liens on, and security interests in, the Prepetition Collateral, among other assets of certain non-Debtors (collectively, the "**Term Loan Liens**").  The Term Loan Liens on the Prepetition Collateral are subordinate and junior in priority to the ABL Liens on the Prepetition Collateral.

39.     As of the Petition Date, approximately $321 million in principal amount is outstanding under the Term Loan Facility.  The Term Loan Lenders have full recourse rights against the Company for these obligations.

(3)     Subordinated Loan Facility

40.     The Debtors are party to that Amended and Restated Term Loan Credit Agreement, dated as of December 19, 2024 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "**Subordinated Loan Credit Agreement**,"[8] and, collectively with the Loan Documents (as defined in the Subordinated Loan Credit Agreement), the "**Subordinated Loan Documents**"), by and among (a) Penney Holdings LLC, as lead administrative borrower, and the other Loan Parties (as defined in the

---

[8]     The Subordinated Loan Credit Agreement amended the underlying Term Loan Credit, Guaranty and Security Agreement, dated as of February 23, 2024, which was in effect immediately prior and up to the Restatement Date (as defined in the Subordinated Loan Credit Agreement).

Subordinated Loan Credit Agreement), including non-Debtor affiliates (together with Penney Holdings LLC, collectively, the "**Subordinated Loan Parties**"), (b) Simon Blackjack Consolidated Holdings, LLC, in its capacity as the administrative agent and collateral agent (in such capacity, the "**Subordinated Loan Agent**"), and (c) the lenders from time to time party thereto. The Subordinated Loan Documents provide for a term loan facility of approximately $169 million (the "**Subordinated Loan Facility**"), with payment-in-kind interest accruing thereon.

41.     The maturity date on the Subordinated Loan Facility is May 26, 2027. The obligations under the Subordinated Loan Documents are secured by liens on, and security interests in, the Prepetition Collateral (the "**Subordinated Loan Liens**"). The Subordinated Loan Liens are subordinate and junior in priority to each of the ABL Liens and the Term Loan Liens on the Prepetition Collateral.

42.     As of the Petition Date, approximately $176 million in principal amount is outstanding under the Subordinated Loan Facility. The Subordinated Loan Parties have full recourse rights against the Company for these obligations.

(4)     Intercreditor Agreements

43.     In connection with the SPARC Acquisition, the Debtors became party to that certain Amended and Restated Intercreditor Agreement, dated as of December 16, 2021 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "**ABL-Term Loan Intercreditor Agreement**"), by and among (a) the ABL Agent, (b) the Term Loan Agent, and (c) the ABL Loan Parties and Term Loan Parties. Among other things, the ABL-Term Loan Intercreditor Agreement sets forth the agreements among the ABL Agent and the Term Loan Agent with respect to the priority of liens on, and security interests in, the Prepetition Collateral.

32822667.17

44. In connection with the SPARC Acquisition, the Debtors also became party to that certain Intercreditor Agreement, dated as of December 19, 2024 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "**Senior-Subordinated Intercreditor Agreement**"), by and among (a) the ABL Agent, (b) the Term Loan Agent, (c) the Subordinated Loan Agent, and (d) the ABL Loan Parties, Term Loan Parties, and Subordinated Loan Parties from time to time party thereto. Among other things, the Senior-Subordinated Intercreditor Agreement sets forth the agreements among the ABL Agent, the Term Loan Agent and the Subordinated Loan Agent with respect to the priority of liens on, and security interests in, the Prepetition Collateral. Pursuant to the Senior-Subordinated Intercreditor Agreement, the parties thereto agreed, among other things, that the Subordinated Loan Liens on the Prepetition Collateral shall be subordinate and junior in all respects to the ABL Liens and Term Loan Liens.

### B. SPARC Payable

45. As described above, the Debtors also benefited from the Cash Pooling Arrangement in the years prior to the SPARC Acquisition. Because the Debtors faced significant financial challenges in recent years, the Debtors believe that they were net beneficiaries under the Cash Pooling Arrangement as this system funded losses at the Debtors' operations. As noted above, as of the Petition Date, approximately $320 million (*i.e.*, the SPARC Payable) is due and payable to Aero by the Debtors.

### C. Equity Interests

46. Each of F21 Puerto Rico, LLC and F21 Giftco Management, LLC is 100% owned by F21 OpCo, LLC. F21 OpCo, LLC, in turn, is 100% owned by SPARC.

## III.     EVENTS IMMEDIATELY PRIOR TO, AND GOALS OF, THE CHAPTER 11 CASES

### A.     The Debtors Face New Financial Headwinds

47.     The Company initially stabilized its retail and e-commerce operations through the 2019 Bankruptcy and successfully implemented certain strategic initiatives thereafter. In fact, as the COVID pandemic eased in 2021, the Company generated $165 million in EBITDA in fiscal year 2021.   In recent years, however, the Debtors' business operations have been negatively impacted by challenges affecting many peer retailers, including persistent inflation, decreased consumer discretionary spending, a stubborn rise in interest rates, contracting margins, supply chain interruptions, competition from non-U.S. retailers taking advantage of the de minimis exemption, and shifting customer preferences.

48.     As a result of these operational obstacles and industry changes, the Debtors' revenue suffered.  The Debtors have lost more than $400 million over the last three fiscal years and, in fiscal year 2024 alone, the Debtors lost approximately $150 million.  Current projections reflect that the Debtors are anticipated to lose $180 million in EBITDA through 2025.

49.     The Company has sought to address its operational issues, and in 2024 it closed approximately 34 retail locations, some under the supervision of Hilco Merchant Resources, LLC ("**Hilco**").[9]  In addition, Simon, among other cooperating landlords, began offering material rent concessions to the Company in April 2024, and ABG similarly extended the Debtors a 50% discount on its licensing fees at that time.[10]  To date, the concessions negotiated with various landlords and ABG, collectively, total over $50 million in savings.

---

[9]     The Store Closing Sales described herein, overseen by the Liquidator Joint Venture (as defined herein), commenced at each of the Debtors' remaining locations prior to the Petition Date.

[10]     This arrangement does not extend to wholesale or online sales.

50. The Company also explored other strategic solutions to address its performance, including commencing an informal outreach to a handful of potential acquirers which, unfortunately, yielded no viable transactions or go-forward business partners. Consequently, given historically declining performance and lack of material unencumbered assets, the Company began to consider both in- and out-of-Court options.

**B. Post-SPARC Acquisition**

51. As noted above, as part of the SPARC Acquisition, Catalyst Brands announced that it was considering strategic options for the Company. In connection with those efforts, the Debtors retained Young Conaway Stargatt & Taylor, LLP ("**Young Conaway**"), Paul, Weiss, Rifkind, Wharton & Garrison, LLP ("**Paul, Weiss**"), and BRG in January 2025 to explore various restructuring or transactional opportunities.[11] In addition, on January 14, 2025, the Debtors created the Board, consisting of two individuals experienced in overseeing distressed situations as both restructuring professionals and directors—Paul Aronzon and Scott Vogel—to oversee the Debtors' restructuring strategy.

52. The Board has been overseeing the Debtors' contingency planning. Among other things, the Board has supervised (a) the ongoing evaluation of the marketing and sales process, (b) the assessment of strategic alternatives if the marketing process does not yield a viable going concern sale, and (c) an investigation (the "**Investigation**") of any potential claims and causes of action that the Company may have against third parties, including insiders. The Board is fully apprised of the Debtors' strategy in these Chapter 11 Cases, including with respect to the

---

[11] The Debtors retained Young Conaway as the Company's primary bankruptcy counsel, and Paul Weiss, which has historically advised the Debtors when owned by SPARC and Catalyst Brands, as the Company's corporate and finance counsel.

ongoing Store Closing Sales and Going Concern Sale Process, as well as the PSA, the contemplated Plan and its material terms.

53.    In the months leading up to the Petition Date, the Debtors' management team, with direction from the Board, began more formally marketing their assets and soliciting bids for a value maximizing transaction.  On or about January 17, 2025, the Debtors retained SSG Capital Advisors, LLC ("**SSG**"), an experienced investment banking firm specializing in middle market situations, to oversee and continue the Going Concern Sale Process that commenced, on an informal basis, in Summer 2024.  Since its engagement, SSG has contacted 217 strategic and financial buyers, 30 of which have entered into confidentiality agreements with the Debtors and engaged in due diligence on the Debtors' assets.  The Debtors also retained Retail Consulting Services, Inc. d/b/a RCS Real Estate Advisors ("**RCS**"), on or about February 20, 2025, to solicit interest in the Debtors' lease portfolio on a standalone basis.  The Debtors' senior management team and advisors have spent significant time meeting with numerous parties interested in acquiring the Debtors' core assets and exploring going concern scenarios for the Debtors' business.

54.    With respect to the Store Closing Sales, prior to selecting the Liquidator Joint Venture (as defined below), the Debtors solicited bids from various third-party consultants, and held diligence sessions to determine which consultant possessed the requisite skills, resources, and experience to perform the Debtors' large-scale going out of business sales in a controlled, efficient, and value-maximizing manner. The Debtors received and, with the assistance of their advisors, carefully considered multiple formal proposals, including that presented by a joint venture comprised of Hilco, Gordon Brothers Retail Partners, LLC, and SB360 Capital Partners, LLC (collectively, the "**Liquidator Joint Venture**").  Notably, all potential bidders contemplated running the Store Closing Sales through a chapter 11 process.  To ensure that the Debtors entered

into a consulting arrangement on the most favorable terms reasonably available under the circumstances, the Debtors spent significant time negotiating the economics of the proposals. Following these extensive negotiations, the Debtors determined to move forward with the proposal submitted by the Liquidator Joint Venture, which the Debtors, in consultation with their advisors and the Board, determined under the circumstances represented the most value-maximizing transaction reasonably available and preserved the best opportunity to consummate an alternative, going-concern transaction should one become feasible.

55.     The Debtors and Liquidator Joint Venture subsequently engaged in arm's-length negotiations with respect to the terms of the Liquidator Joint Venture's retention to conduct the Store Closing Sales and, on February 12, 2025, the Debtors and Liquidator Joint Venture executed an amendment to the agency agreement previously entered into by and between the Company and Hilco (such amendment, the "**Agency Agreement Amendment**," and the underlying agency agreement, the "**Agency Agreement**").  Among other things, the Agency Agreement Amendment binds the new participants in the Liquidator Joint Venture to the initial Agency Agreement entered into with Hilco and memorializes the terms for the Liquidator Joint Venture's compensation.  Prior to the Petition Date, on or about February 14, 2025, the Company commenced Store Closing Sales at approximately 236 of the Debtors' retail locations, initiating an incremental closing process that will allow the Debtors to minimize time in chapter 11 and to exit stores quickly.  Subsequently, the Company commenced Store Closing Sales at the Debtors' remaining 118 locations on or about February 27, 2025.  Pursuant to the Agency Agreement Amendment and subject to Court approval, the Liquidator Joint Venture will serve as the exclusive agent to the Debtors in connection with the Store Closing Sales during these Chapter 11 Cases.

56.     The Agency Agreement Amendment provides that the Debtors and Liquidator Joint Venture expect to complete all Store Closing Sales before May 1, 2025, with many Store Closing Sales ending before April 1, 2025.   While the Store Closing Sales are conducted, the Going Concern Sale Process will continue to run its course as the Debtors and their advisors work towards achieving a value maximizing, go-forward transaction.   To facilitate this process, the Debtors will file a motion seeking approval of bid procedures and various related deadlines in the near term.

## IV.     THE INVESTIGATION

57.     As discussed above, the independent Board began assessing and investigating any potential claims or causes of action that the Debtors may have against third parties, including insiders.   Accordingly, while the Debtors pursued the strategic alternatives discussed herein in the months prior to the Petition Date, the Board also undertook the Investigation.

58.     As part of that process, the Board interviewed Young Conaway in January 2025 to determine its experience and approach in conducting investigations in similar situations, both in and out of court, and to confirm Young Conaway's capacity and available resources to conduct the Investigation.   After interviewing Young Conaway, it is my understanding that the Board conferred and determined that, because of Young Conaway's experience in such matters and its ability to commit a dedicated team to complete the Investigation in an efficient and thorough manner, it would be in the best interests of the Company to retain Young Conaway to assist and advise the Board in connection with the Investigation.   The Board retained Young Conaway as its counsel, for purposes of the Investigation, on January 21, 2025, and immediately began the Investigation thereafter.

## V.    CONSENSUAL USE OF CASH COLLATERAL AND PLAN OF LIQUIDATION

59.    In January and February 2025, the Debtors approached the ABL Agent and the Term Loan Agent to discuss the Company's financial situation and related determination to wind down the Debtors' operations while also pursuing going concern alternatives.  To assist with this process, BRG worked with the Debtors, the ABL Agent, and the Term Loan Agent to prepare a budget and cash flow forecast to support the execution of a chapter 11 proceeding to implement the Going Concern Sale Process, the Store Closing Sales, or both in parallel.  As part of those discussions, the Company also proposed the material terms for an agreement that would allow the Debtors to use cash collateral on a consensual basis during the pendency of these proceedings, as well as a liquidating plan that would streamline these Chapter 11 Cases and provide finality for all interested parties.  As a result of those discussions, the Debtors and all ABL Lenders and Term Loan Lenders entered into the PSA, dated March 16, 2025.

60.    The PSA, among other things, memorializes the material terms of the Plan and concessions obtained by the Debtors from their secured creditors for the benefit of unsecured creditors.  At a high level, the Debtors have negotiated a distribution—which could be as much as 6% of distributable proceeds—to general unsecured creditors which would otherwise be significantly out of the money given forecasted recoveries for the Debtors' assets and the lack of any material unencumbered assets.  In connection with the PSA, the Debtors and the ABL Agent also reached an agreement which will enable the Debtors to use cash collateral on a consensual basis during the duration of these Chapter 11 Cases and use the cash proceeds from the Store Closing Sales and any successful Going Concern Sale to fund the administrative claims incurred.  The Cash Collateral Order (as defined below) is accompanied by a budget (the "**Budget**"), which I believe positions the Debtors to prosecute these Chapter 11 Cases, including with respect to the Plan, and implement a responsible and orderly wind-down upon confirmation and consummation

32822667.17

thereof.  For the reasons described below, I believe that the Budget accounts for payment or satisfaction of all reasonably anticipated administrative expense and priority claims associated with these Chapter 11 Cases, including claims arising under section 503(b)(9) of the Bankruptcy Code, and, therefore, will leave the estates with sufficient cash to confirm the Plan and go effective shortly thereafter.

61.    Finally, the PSA and proposed cash collateral order memorialize the agreement reached between the Debtors and their secured lenders with respect to certain case milestones, which are summarized below:

| | |
|---|---|
| Deadline to file Plan & Disclosure Statement | March 26, 2025 |
| Deadline to Obtain Final Cash Collateral Order & Store Closing Order | April 20, 2025 |
| Deadline to Obtain Entry of Solicitation Procedures Order | May 5, 2025 |
| Deadline to Obtain Entry of Confirmation Order | June 14, 2025 |
| Deadline for Plan to go Effective | June 19, 2025 |

## VI.    THE FIRST DAY PLEADINGS

62.    In connection with the commencement of these Chapter 11 Cases, the Debtors have filed First Day Pleadings seeking to, among other things:

    a.  satisfy certain wage and tax obligations;

    b.  ensure the continuation of the Debtors' cash management system and insurance programs without interruption;

    c.  obtain authority to use cash collateral on a consensual basis;

    d.  provide adequate assurance of payment to the Debtors' utility providers;

    e.  continue certain customer programs for a limited period of time;

    f.   obtain authority to satisfy certain prepetition claims held by certain of the Debtors' shippers, warehousemen and potential lienholders; and

    g.   implement certain store closing sale procedures which will govern the Store Closing Sales at the Debtors' remaining retail locations.

63.    I am familiar with each First Day Pleading and, absent the relief requested therein, I believe that the Debtors would suffer immediate and irreparable harm that would jeopardize their ability to maintain their business operations in a value-maximizing manner during the pendency of these proceedings.  Specifically, absent the relief requested, I believe that the Debtors' ability to maximize value through the Store Closing Sales would be impaired and the Going Concern Sale Process would be similarly compromised.  I further believe that the relief sought in the First Day Pleadings is critical to the Debtors' efforts to both transition into chapter 11 efficiently and minimize disruptions to their business operations while the wind down is accomplished and the marketing and sale process runs its course.  Finally, I believe that the First Day Pleadings reflect the thorough and targeted analyses of the Debtors' management team and professional advisors, and capture relief that is narrowly constructed and, indeed, critical to the success of these Chapter 11 Cases.

64.    As a result of my first-hand knowledge, and through my review of various materials and information and discussions with members of the Debtors' management team and the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Pleadings, (b) the need for the Debtors to operate effectively while working to maximize the value of their assets for the benefit of all stakeholders, and (c) the immediate and irreparable harm to which the Debtors will be exposed upon the commencement of these Chapter 11 Cases unless the limited relief requested in the First Day Pleadings is granted without delay.

65.     As described more fully below, the relief requested in the First Day Pleadings was carefully tailored by the Debtors, in consultation with their advisors, to ensure that (a) the Debtors' immediate operational needs are met so that the Debtors can maximize value through the wind down and Going Concern Sale Process, as applicable; and (b) the Debtors do not suffer immediate and irreparable harm at the outset of these Chapter 11 Cases that would undermine their ability to achieve the best recovery, under the circumstances, for interested parties. I, or my colleagues at my instruction, participated in the analysis that informed each First Day Pleading, and assisted in developing the relief requested therein and reviewed the pleadings related thereto. At all times, the Debtors' management team and professionals remained cognizant of the limitations imposed on a debtor in possession and, given those limitations, the Debtors narrowed the relief requested at the outset of these Chapter 11 Cases to those matters that require urgent relief to sustain the Debtors' immediate operations and preserve value during the pendency of these Chapter 11 Cases. It is my opinion that the Debtors would suffer immediate and irreparable harm if the relief requested in the First Day Pleadings is not granted on the terms proposed.

a.     *Debtors' Motion for Entry of an Order Authorizing the Joint Administration of Related Chapter 11 Cases (the "__Joint Administration Motion__")*

66.     The Debtors request entry of an order approving the joint administration of these Chapter 11 Cases for procedural purposes only. I believe that it would be far more practical and expedient for the administration of these Chapter 11 Cases if the Court were to authorize their joint administration, which will reduce costs and facilitate the administrative process by avoiding the need for duplicative notices, applications, and orders. It is my understanding that no prejudice will befall any party by the joint administration of the Debtors' cases, as the relief sought therein is solely procedural, and not intended to affect substantive rights. Given the foregoing, the Debtors respectfully request that the relief sought in the Joint Administration Motion be approved.

b.      *Debtors' Application for Entry of an Order Authorizing the Debtors to Employ and Retain Kurtzman Carson Consultants, LLC dba Verita Global as Claims and Noticing Agent Effective as of the Petition Date (the "**__Claims Agent Retention Application__**")*

67.     The Debtors request entry of an order, pursuant to 28 U.S.C. § 156(c), Rule 2002(f) of the Federal Rules of Bankruptcy Procedure, and Rule 2002-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "**__Local Rules__**"), authorizing the retention and appointment of Kurtzman Carson Consultants, LLC, dba Verita Global ("**__Verita__**") as claims and noticing agent in these Chapter 11 Cases.  I believe that the relief requested in the Claims Agent Retention Application will ease the administrative burden on the Clerk of the Court in connection with these Chapter 11 Cases.  In addition, I have been advised by the Debtors' proposed counsel that Verita's retention is required by the Local Rules given the Debtors' anticipated number of creditors.  In light of the foregoing and Verita's competitive rates, the Debtors respectfully request that the application to retain Verita as claims and noticing agent be approved.

c.      *Debtors' Motion for Entry of an Order (I) Authorizing Debtors to Redact Certain Personally Identifiable Information from the Creditor Matrix and Other Documents; and (II) Granting Related Relief (the "**__Creditor Matrix Motion__**")*

68.     The Debtors seek entry of an order authorizing the Debtors to redact certain personally identifiable information of the Debtors' customers and current and former employees, including their respective home and email addresses, included in the Debtors' creditor matrix, the Debtors' schedules of assets and liabilities and statements of financial affairs, and other documents filed in these Chapter 11 Cases.

69.     The Debtors submit that the employees and customers, who have no other connection to these Chapter 11 Cases and who may not currently work for the Debtors or realize their personally identifiable information is maintained by the Debtors, should not be required to

monitor the docket in these Chapter 11 Cases to protect themselves from the threat of identity theft or harm.   Given the circumstances, I believe that shielding these individual creditors from publication of their home and email addresses is necessary and appropriate to safeguard their privacy and security.   Accordingly, the Debtors respectfully request that the relief requested in the Credit Matrix Motion be approved.

      d.     *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay and Honor Certain (A) Prepetition Wages, Benefits, and Other Compensation Obligations; (B) Prepetition Employee Business Expenses; (C) Bonus Program Obligations; and (D) Workers' Compensation Obligations; (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations; and (III) Granting Related Relief (the "__Wages Motion__")*

      70.     Pursuant to the Wages Motion, the Debtors request entry of interim and final orders (i) authorizing, but not directing, the Debtors, on the terms set forth in the proposed orders and in accordance with their stated policies and in their discretion, to, among other things and subject to the statutory cap on priority claims, (a) pay prepetition employee wages, salaries and other accrued compensation, (b) pay accrued prepetition obligations to independent contractors and supplemental workers employed by the Debtors, (c) honor any prepetition obligations in respect of, and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' employee benefits programs, plans, and policies, (d) reimburse employees for prepetition expenses that employees incurred on behalf of the Debtors in the ordinary course of business, (e)  pay all related prepetition payroll taxes and other deductions, (f) honor the Debtors' workers' compensation policies, (g) continue and fully-implement a store closing bonus program (the "__Store Level Retention Program__") for non-insiders who remain with the Company through the Store Closing Sales, and (h) to the extent that any of the foregoing programs are administered, insured, or paid through a third-party administrator or provider, pay certain prepetition claims of such administrator and provider in the

32822667.17

ordinary course of business to ensure the uninterrupted delivery of payments or other benefits to the Employees, and (ii) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing.

71.     As of the Petition Date, the Debtors employ approximately 1,750 full-time employees, 7,190 part-time employees, and approximately 320 seasonal employees (collectively, the "**Employees**").  The Debtors also employ between five and ten independent contractors and/or supplemental workers (collectively, the "**Supplemental Workforce**") whose services are often procured indirectly through certain staffing agencies.  Although the Debtors have paid their wage, salary, and other obligations in accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition obligations for Employees and the Supplemental Workforce may nevertheless be due and owing.

72.     With respect to the Store Level Retention Program, the Debtors offered retention bonuses, based on a range of considerations, to approximately 1,360 store-level employees prior to the Petition Date who serve in managerial roles at the Debtors' stores.  This program was instituted to ensure that the Debtors have a sufficient manager and supervisor-level workforce at the Debtors' retail locations to allow the Store Closing Sales to reach their optimal results.  Indeed, the participants in the Store Level Retention Program, each of whom serves as a store manager, store supervisor or assistant store manager, respectively, have the necessary skill and familiarity with the Debtors' inventory and sale processes to support the Liquidator Joint Venture during the Store Closing Sales, and form a critical component of the Debtors' wind down strategy.  I have reviewed the list of Store Level Retention Program participants and discussed the participants with the Debtors' other senior management members.  Having reviewed the subject employees' titles and gained a clear understanding of their respective responsibilities and roles

within the Debtors' operational framework, I believe that there are no "insiders", as such term is defined in the Bankruptcy Code, participating in the Store Level Retention Program. Moreover, based on my substantial experience with, among other things, liquidating retailers, I believe that the Store Level Retention Program will have material benefits for the Store Closing Sales and the costs associated with such program will be greatly outweighed by the benefits realized by the estates arising therefrom. To date, the participants in the Store Level Retention Program have already helped drive revenue at applicable closing stores prior to the Petition Date, and their continued dedication and commitment will ensure that the Store Closing Sales are a success.

73.     With respect to the broader relief sought in the Wages Motion, many of the Debtors' Employees rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial hardship if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical to the Debtors' ability to maximize value through the Store Closing Sales and, indeed, preserve and maintain going concern value while the Going Concern Sale Process runs its course.

74.     I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption to maximize the value of their assets. Accordingly, the Debtors respectfully request that the relief set forth in the Wages Motion be approved.

e.  *Debtors' Motion for Entry of Interim and Final Orders (I)(A) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service, (B) Deeming Utility Companies to Have Adequate Assurance of Future Payment, and (C) Establishing Procedures for Resolving Requests for Additional Assurance, and (II) Granting Related Relief (the "**Utility Motion**")*

75.     Pursuant to the Utility Motion, and to ensure continued provision of utility services (the "**Utility Services**") to the Debtors' corporate headquarters, distribution center and retail locations, the Debtors seek entry of interim and final orders (i) prohibiting the Debtors' utility service providers (collectively, the "**Utility Service Providers**") from altering, refusing, or discontinuing utility service on account of unpaid prepetition invoices, (ii) deeming the Utility Service Providers to be adequately assured of future payment, and (iii) establishing procedures for determining additional adequate assurance of future payment and authorizing the Debtors to provide adequate assurance of future payment to the Utility Service Providers.  The Debtors propose establishing a segregated account into which the Debtors will deposit a sum equal to approximately 50% of the Debtors' estimated aggregate monthly utility expenses and, additionally, have proposed standard procedures to address any request made by the Utility Service Providers for additional adequate assurance.

76.     Any disruption of the Debtors' Utility Services would cause irreparable harm to the Debtors' business operations, their estates, and their ability to prosecute these Chapter 11 Cases in a manner that will maximize value for all interested parties.

77.     For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in the Utility Motion is in the best interest of the Debtors, their estates, and their creditors, and should therefore be approved.

f.   *Debtors' Motion for Entry of Interim and Final Orders (I)(A) Authorizing Payment of Certain Prepetition Taxes and Fees and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests and (II) Granting Related Relief (the "**Taxes Motion**")*

78.   By the Taxes Motion, the Debtors request entry of interim and final orders (i) authorizing, but not directing, the Debtors, in their discretion, to remit certain taxes including sales, use, franchise, commercial activity, business and occupation, and various other taxes, fees, charges, and assessments (collectively, the "**Taxes and Fees**") that the Debtors incurred prepetition that are or will become due and payable to various federal, state, and local taxing authorities and other governmental authorities (each, an "**Authority**," and collectively, the "**Authorities**"), including in connection with the sale of their merchandise at applicable store locations, or through shipments of apparel purchased through the Debtors' website to customers, and (ii) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing.

79.   The Taxes and Fees are paid periodically to the respective Authorities, depending on the given Tax or Fee and the relevant Authority to which it is paid.   Additionally, due to the large number of stores that the Debtors operate, the Debtors employ Vertex, Inc (the "**Tax Servicer**") to assist with remitting Taxes to the Authorities.   The Debtors pay the Tax Servicer monthly fees of approximately $56,000 for its services.

80.   As of the Petition Date, the Debtors estimate that they owe approximately $250,000 in unremitted Taxes and Fees, $50,000 of which will come due within 30 days of the Petition Date.[12]   Except with respect to certain potential trust fund tax liabilities that are subject to

---

[12]   Prepetition, the Debtors issued funds to the Tax Servicer in the amount of approximately $6 million to cover prepetition estimated sale taxes that had accrued on account of actual and projected prepetition sales, plus additional funds to cover estimated postpetition sales tax for March 2025.   The Debtors have instructed the Tax Servicer to remit the funds to the applicable Authority when the sales taxes come due.   To the extent that the prepayment is insufficient to cover all sales taxes, the Taxes Motion contemplates a modest cushion to true up prepetition sales tax that comes due.   To the extent that the prepayment exceeds actual sale taxes owing, the Tax

ongoing audit, as disclosed in the Taxes Motion, the unremitted Taxes are comprised entirely of current tax obligations, and are not in respect of "catch-up" payments.

81.     Any regulatory dispute or delinquency that impacts the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' ability to maximize value though these proceedings.  Moreover, some Authorities may initiate an audit of the Debtors if the Taxes and Fees are not paid on time.  Such audits will unnecessarily divert the Debtors' attention away from these Chapter 11 Cases and result in unnecessary expenses.  Moreover, if the Debtors do not pay such amounts in a timely manner, the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, seek payment from the Debtors' directors and officers, or pursue other remedies that will materially and immediately harm the estates.

82.     I believe that the Debtors' failure to pay the Taxes and Fees could have a material adverse impact on the Debtors' ability to maximize the value of their assets for the benefit of all stakeholders.  Additionally, any attempt to collect the Taxes and Fees from the Debtors' directors and officers has the potential to divert the attention of those individuals away from the Debtors' efforts to maximize the value through these proceedings.

83.     Accordingly, for the reasons set forth herein and in the Taxes Motion, the Debtors respectfully request that the Taxes Motion be approved.

---

Servicer will hold the funds on account for the Debtors and will apply such exceeds funds to future sales tax payments.

g.   *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Maintenance, Administration, and Continuation of Debtors' Customer Programs and (II) Granting Related Relief (the "**Customer Programs Motion**")*

84.    In the ordinary course of business, the Debtors have historically provided customers with certain customer-related programs (the "**Customer Programs**") that engender goodwill, maintain loyalty, and increase the Debtors' sales opportunities.

85.    Given the current strategy, and as set forth in the Customer Programs Motion, the Debtors seek authority to honor their gift card obligations through and including April 15, 2025 (the "**Gift Card Termination Date**"), which is thirty days after the Petition Date.  No later than March 3, 2025, the Debtors stopped selling gift cards at their store point-of-sales and on their ecommerce website.  No later than the Petition Date, the Debtors posted conspicuous signage at their stores advising customers that gift cards would be honored through the Gift Card Termination Date, and a banner was placed on the Debtors' website advising online customers in the same manner.

86.    Beyond their gift card program, which is discussed in further detail in the Store Closing Motion (as defined below) and is subject to the relief sought therein, the Debtors seek limited relief with respect to their Customer Programs to (i) retain their reputation for reliability while the Store Closing Sales are implemented, (ii) meet competitive market pressures, (iii) maintain positive customer relationships, notwithstanding the ongoing liquidation, and (iv) ensure customer satisfaction, preserving brand value during the Chapter 11 Cases and thereby enhancing the Debtors ability to maximize value in the event the Going Concern Sale Process manifests a buyer for substantially all, or a subset, of the Debtors' assets.

87.    Accordingly, for the reasons set forth herein and in the Customer Programs Motion, I believe that the narrow relief requested in the Customer Programs Motion is necessary

to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

h.   *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Claims for Goods Ordered Prepetition and Delivered Postpetition, (II) Authorizing Payment of Certain Prepetition Shipping, Warehouse, Delivery and Customs Charges, and (III) Granting Related Relief (the "__Shippers Motion__")*

88.   Pursuant to the Shippers Motion, the Debtors request entry of interim and final orders authorizing, but not directing, the Debtors to pay, in the ordinary course of business, claims held by certain of the debtors' shippers, freight forwarders and warehousemen (collectively, the "**Transporters**") in possession of the Debtors' inventory as of the Petition Date.  To ensure the steady movement of merchandise, the Debtors rely on a network of shippers and freight forwarders that process, ship and replenish the Debtors' inventory.  If the Debtors fail to pay any of the foregoing entities for charges incurred in connection with the transportation of the Debtors' merchandise, various statutes, tariffs, and agreements permit the shipper, freight forwarders, and warehousemen to assert possessory liens against the merchandise in their possession.

89.   As of the Petition Date, the Debtors estimate that approximately $2,000,000 is owed on account of claims, all of which will come due on or before 30 days from the date hereof for shipping, freight forwarding, and customs duties (the "**Transporter Claims**").  Payment of the foregoing Transporter Claims will avoid disruption in the Debtors' business, prevent the possibility of possessory liens being asserted against the Debtors' merchandise, and enable the Debtors to realize maximum value for the benefit of their stakeholders.  I further believe that authority to satisfy the Transporter Claims will avoid the immediate and irreparable harm that would be thrust upon the estates if such claims were not paid because it will ensure that the Transporters will continue to provide vital services during this critical juncture of the Debtors' chapter 11 efforts.

90.     Because payment of the prepetition Transporter Claims is imperative to the Debtors' ability to maximize the value of their estates for the benefit of their creditors, the Debtors respectfully request that the relief requested in the Shippers Motion be approved.

i.      *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue (A) to Maintain Prepetition Insurance Policies, (B) to Maintain Prepetition Surety Bonds, and (C) to Use the Services of the Broker; and (II) Granting Related Relief (the "__Insurance Motion__")*

91.     By the Insurance Motion, the Debtors request entry of interim and final orders (i) authorizing, but not directing, the Debtors, in the ordinary course of business, as needed, to (a) continue to maintain and administer their prepetition insurance policies and revise, extend, renew, supplement, or change such policies (including by obtaining "tail" coverage) (collectively, the "**Insurance Program**") summarized in the Insurance Motion, (b) maintain, extend, renew, supplement, and/or modify their prepetition surety bonds, and (c) continue to use the services of the Broker (defined below); and (ii) granting related relief.

92.     In the ordinary course of business, the Debtors maintain a number of insurance policies for, among other things, (a) general liability, (b) umbrella, (c) automobile, (d) property/all risk, (e) directors & officers liability, employment practices liability, fiduciary liability, commercial crime, and kidnap and ransom, (f) excess liability, (g) adwrap, (h) cyber, and (i) international, travel, and ocean cargo, among others.  The Debtors employ Marsh USA LLC (the "**Broker**") to assist them with the procurement and negotiation of their Insurance Program. In exchange for their services, the Debtors (through SPARC) pay the Broker certain fees (the "**Broker Fees**") on a commission basis.

93.     I believe that maintaining the Debtors' insurance coverage under the Insurance Program is a crucial ordinary-course-of-business transaction, and necessary to preserve value during these Chapter 11 Cases.  Furthermore, it is my understanding that, under the chapter

11 operating guidelines issued by the United States Trustee for Region 3 pursuant to 28 U.S.C. § 586, the Debtors are obligated to maintain certain insurance coverage during these Chapter 11 Cases, and such coverage is provided by certain of the policies included in the Insurance Program.

94.     Accordingly, for the reasons set forth herein and in the Insurance Motion, the Debtors respectfully request that the relief requested in the Insurance Motion be approved.

j.     *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Cash Management System; (II) Authorizing Use of Prepetition Bank Accounts and Certain Payment Methods; (III) Authorizing Continued Performance of Intercompany Transactions in the Ordinary Course of Business; and (IV) Granting Related Relief (the "**Cash Management Motion**")*

95.     In the ordinary course of their business, the Debtors maintain a complex cash management system (the "**Cash Management System**") that includes all activities necessary and pertinent to collecting and disbursing the Debtors' cash assets.  The Cash Management System allows the Debtors to efficiently identify the Debtors' cash requirements and transfer cash as needed to respond to these requirements.  The Cash Management System is important to the Debtors' business operations, and, ultimately, to maximizing the value of the Debtors' estates.

96.     The Cash Management System currently consists of 103 bank accounts (collectively, the "**Bank Accounts**"). The Bank Accounts are maintained at PNC Bank, N.A. ("**PNC**"), Bank of America, N.A. ("**BofA**"), Banco Popular de Puerto Rico ("**Banco Popular**" or "**BP**"), and JPMorgan Chase Bank, N.A. (collectively with PNC, BofA, and Banco Popular, the "**Banks**").  All Bank Accounts are owned by Debtor F21 OpCo, LLC, except with respect to the Bank Accounts at Banco Popular, which are owned by Debtor F21 Puerto Rico, LLC.  In the ordinary course of business, the Debtors use their Cash Management System to collect, transfer, and distribute funds and facilitate cash monitoring, forecasting, and reporting.  The Bank Accounts are described in greater detail in the Cash Management Motion.

32822667.17

97.     Additionally, in the ordinary course of business, the Debtors have, historically, engaged in routine business transactions with other Debtors and certain non-Debtor affiliates (the "**Intercompany Transactions**"). These Intercompany Transactions result in intercompany receivables and payables (the "**Intercompany Claims**"). Accordingly, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor or between a Debtor and one or more of its non-Debtor affiliates.

98.     As described in detail above, after the F21 Acquisition, the Debtors began participating in a cash pooling system that SPARC had developed for its collection of brands. Given this construct, the Debtors seek authority to continue engaging in Intercompany Transactions in the ordinary course of business during these Chapter 11 Cases, including with their non-Debtor affiliates on a limited basis. The Debtors benefit from numerous services that they share with their non-Debtor affiliates under the SPARC umbrella (the "**Shared Services**"). For example, the Debtors receive from their non-Debtor affiliates (i) funding for the Debtors' payroll obligations; (ii) coverage through the non-Debtor affiliates' insurance program; and (ii) various corporate personnel to support the Debtors' operations. The Debtors seek authority to pay their non-Debtor affiliates only for actual and necessary benefits that such non-Debtor affiliates provide to the Debtors during these Chapter 11 Cases (*i.e.* on an administrative claim basis). Absent the ability to pay the non-Debtor affiliates for the Debtors' share of the Shared Services, the non-Debtor affiliates may discontinue providing Shared Services that benefit the Debtors and, as a result, the Debtors' payroll and insurance obligations may not be met (among other things), and they would be left without significant personnel necessary to ease the Debtors' transition into chapter 11.

99.     Accordingly, by the Cash Management Motion, the Debtors seek authority, but not direction, to continue the Intercompany Transactions, and request, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, that postpetition Intercompany Claims resulting from ordinary course Intercompany Transactions be accorded administrative priority.  However, for the avoidance of doubt, the Debtors do not seek authority to make payments on account any portion of the SPARC Payable that was incurred prepetition and will only make payments on Intercompany Claims that arise during these Chapter 11 Cases.

k.      *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**___Cash Collateral Motion___**")

100.    The Debtors require cash to fund their business throughout these Chapter 11 Cases and to pursue the Store Closing Sales and the Going Concern Sale Process.  The Debtors have determined that access to Cash Collateral will be sufficient to continue operating their remaining business during these Chapter 11 Cases while pursuing a value-maximizing and orderly liquidation process for the benefit of all stakeholders.  Without prompt access to Cash Collateral, the Debtors would be unable to (a) pay employee wages, insurance, and other critical obligations or (b) fund the administration of these Chapter 11 Cases, which would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

101.    At this time, the Debtors seek authority to use Cash Collateral on an interim basis pending entry of the Final Order (such interim period, the "**__Interim Period__**").  Following extensive arm's length and good faith negotiations between the Debtors and the Prepetition Secured Parties, the Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral to fund operations and the costs of administering their estates during the Interim Period in accordance with the Approved Budget (as defined herein), subject to the Permitted Variances

(as defined in the Cash Collateral Motion), on the terms set forth in the Proposed Orders.  By the Cash Collateral Motion, the Debtors also seek authority to continue the consensual use of Cash Collateral on a final basis.

102.    The Debtors, in consultation with BRG, prepared a 13-week cash flow (as may be updated from time to time in accordance with the terms of the Interim Order, the "**Approved Budget**") reflecting anticipated cash receipts, operating disbursements, and non-operating expenditures, among other things.  The Debtors believe that the Approved Budget establishes that the Debtors should have adequate liquidity to prosecute these Chapter 11 Cases in the manner contemplated.  The Approved Budget contains line items for cash flows anticipated to be received and disbursed during the time-period for which the Approved Budget has been prepared.  The Debtors believe that the Approved Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in the first thirteen weeks of these Chapter 11 Cases.

103.    The Debtors have an immediate postpetition need to use Cash Collateral. The Debtors cannot maintain the value of their estates during the pendency of these Chapter 11 Cases or pursue the Store Closing Sales or the Going Concern Sale Process without access to Cash Collateral.   The Debtors believe that substantially all of their available cash constitutes the Prepetition Secured Parties' Cash Collateral.  The Debtors will, therefore, be unable to proceed with the Store Closing Sales or the Going Concern Sale Process, or otherwise fund these Chapter 11 Cases without immediate access to Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest in the event that the relief requested in the Cash Collateral Motion is not granted.  Accordingly, for the reasons set forth herein and in the Cash Collateral Motion, the Debtors respectfully request that the Cash Collateral Motion be approved.

32822667.17

l.    *Debtors' Motion for Entry of Interim Order Authorizing the Conduct of the Store Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and Final Order Authorizing (I) the Debtors to Assume the Agency Agreement, (II) The Conduct of the Store Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and (III) Granting Related Relief (the "__Store Closing Motion__")*

104.    As of the Petition Date, the Debtors operated 354 stores across the United States and Puerto Rico.  As described herein, prior to the Petition Date, the Debtors solicited interest in their business on a going concern basis while, simultaneously and in furtherance thereof, completing a comprehensive review of their retail stores' performance in an effort to analyze, among other things, the profitability and viability of each store location and to determine whether the Debtors' leasehold interests hold any material value.

105.    As a culmination of these efforts, the Debtors, with the assistance of their advisors, developed a store closing strategy (the "__Store Closing Process__") to be implemented during the pendency of these Chapter 11 Cases.  The Store Closing Process commenced prior to the Petition Date, on approximately February 14, 2025, when the Debtors initiated wave 1 (the "__Wave 1 Sales__") of the Store Closing Sales at approximately 236 retail locations.[13]  The Wave 1 Sales are occurring at the Debtors' poorest performing stores and, I believe, upon discussions with the Debtors' management team, SSG, and the Debtors' legal advisors, that it is unlikely that any third party would be interested in acquiring these locations as part of a going concern transaction.  Consequently, I believe that it was prudent and appropriate to commence the Wave 1 Sales one month prior to the Petition Date.  It is currently contemplated that Wave 1 Sales will conclude on or about the week ending March 30, 2025, allowing the Debtors to vacate the majority of the subject properties prior to April 2025, thereby avoiding the incurrence of significant

---

[13]    The Debtors concluded liquidations at approximately 35 locations prior to the Petition Date, separate and apart from the Store Closing Process described herein.

rental obligations.  Wave 2 of the Store Closing Sales (the "**Wave 2 Sales**") began at the Debtors' remaining locations on or about February 27, 2025, and it is anticipated that the Wave 2 Sales will conclude prior to May 1, 2025.

106.    As briefly described above, the Debtors negotiated with, and entertained bids from, three reputable and experienced liquidators before engaging the Liquidator Joint Venture and commencing the Store Closing Sales in earnest.  The Debtors selected the Liquidator Joint Venture because of its collective expertise in conducting store closing sales, including the orderly liquidation of merchandise and inventory similar to that sold by the Debtors, as well as certain furniture, fixtures, equipment, and other assets that need to be monetized.  The Debtors negotiated the terms and conditions of the Agency Agreement and the Agency Agreement Amendment in good faith and at arms' length.

107.    The Debtors devoted significant time and effort preparing for the Store Closing Sales.  These preparations included, among other things, the following:

- Stopping the delivery of ordinary replenishments to the subject stores in February 2025, thereby limiting the Debtors' exposure with respect to claims which could otherwise potentially qualify for administrative expense priority under section 503(b)(9) of the Bankruptcy Code;

- Ordering customized specialty banners and signs announcing the Store Closing Sales at applicable locations;

- Informing and engaging with their employees at the closing stores about the Store Closing Process and related timing;

- Posting price markdowns throughout the closing stores and marking inventory therein to reflect the price markdowns consistent with applicable liquidation strategy; and

- Designing and implementing the Store Level Retention Program, described above.

108.    Overall, I believe that the Debtors and their advisors invested a substantial amount of time and money in preparation for implementing the Store Closing Sales in an efficient, orderly, and value-maximizing manner.

109.    The Debtors, in conjunction with BRG, determined that entering into the Agency Agreement Amendment and conducting the Store Closing Sales through the Wave 1 Sales and Wave 2 Sales, respectively, would provide the greatest return to the Debtors' estates for the subject assets.  I believe that the terms set forth in the Agency Agreement Amendment, and the Agency Agreement, are the best alternative for conducting the Store Closing Sales, and I believe that the Store Closing Sales, themselves, represent the best opportunity to maximize value through these Chapter 11 Cases.  The terms of the Agency Agreement Amendment are the result of arms' length bargaining and subject to competitive bidding among interested parties, and I believe them to be the best terms available to the Debtors.  Moreover, I understand that the Liquidator Joint Venture is already familiar with the Debtors' business, given that it began preparations for, and commenced, both the Wave 1 Sales and Wave 2 Sales prior to the Petition Date.  In this context, I believe that there would be significant harm to all stakeholders if the Agency Agreement Amendment is not assumed.  The costs that would arise from any delay of the ongoing closing sales, the time and effort required to conduct a further process to find a new agent, and the disruption of the to the Debtors' store closing strategy would lead, in my view, to a material loss of value and increased administrative expense.

110.    The Debtors, in consultation with BRG, have determined that the Store Closing Process represents the best alternative to maximize recoveries to the Debtors' estates.  I believe that interrupting and, by consequence delaying, the closing sales would diminish the recoveries on the Debtors' remaining inventory for several important reasons.  First, I understand

that many of Debtors' retail locations fail to generate positive cash flow and therefore are a significant drain on liquidity.  As such, I believe that the Debtors will realize an immediate benefit in terms of financial liquidity by monetizing remaining merchandise and related assets and, shortly thereafter, terminating operations and surrendering possession of applicable premises to subject landlords.  Indeed, the approved Budget relies, in part, on cash proceeds to be generated by the Store Closing Sales.  Second, I understand that allowing the liquidations to continue on the timeline proposed will allow the Debtors to vacate applicable stores more quickly and, consequently, avoid the accrual of unnecessary administrative expenses.

111.    I believe that the decision to continue and, ultimately, conclude the Store Closing Process prior to May 1, 2025, was made on an informed basis, with input from the Board and the Debtors' advisors.  I believe, in consultation with SSG, that the Store Closing Process will not materially harm the Going Concern Sale Process which, remains ongoing as of the date hereof. Indeed, I believe that by continuing the Store Closing Process, which was initiated prepetition, the Debtors are striking the appropriate balance with respect to efficiently liquidating their assets, while also continuing to solicit and field interest in any and all potential go-forward possibilities to maximize estate value.  As noted above, the Debtors do not own any valuable intellectual property, which has, in my view, inhibited interest in maintaining the Debtors as a going concern, thereby limiting the prospects for any sizable (and viable) transaction that would be more valuable to the Debtors' estates than proceeds yielded from the Store Closing Process.

m.    *Debtors' First (1st) Omnibus Motion For Entry of an Order Authorizing (I) Rejection of (A) Certain Unexpired Leases of Nonresidential Real Property (B) Certain Executory Contracts, and (C) Abandonment of Any Remaining Personal Property Located at the Leased Premises, Effective as of the Petition Date, and (II) Granting Related Relief (the "__Rejection Motion__")*

112.    In connection with closing approximately seventeen (17) retail locations (such stores, the "__Closed Stores__") prior to the Petition Date, each of which was liquidated separate

and apart from the Store Closing Process described herein, the Debtors delivered surrender letters (collectively, the "**Surrender Letters**"), together with keys and other pertinent information, to each landlord counterparty to the subject premises (collectively, the "**Landlords**").  The Surrender Letters notified the Landlords that the Debtors were unequivocally surrendering possession of the subject premises and abandoning any Debtor-owned personal property as of such time. Contemporaneously herewith, the Debtors will be filing the Rejection Motion to reject such leases (such leases, the "**Rejected Leases**") to ensure that the relief requested therein will be effective as of the Petition Date but will schedule a hearing on such motion for a later date.  The Debtors believe that each Rejected Lease expired by its respective terms or has otherwise been properly terminated.  However, the Debtors determined to file the Rejection Motion, out of an abundance of caution, to ensure that impacted landlords and any other affected third party are on notice of the Debtors' intent to unequivocally surrender any interest in the subject leasehold interests, to the extent any such interest has been arguably maintained.

113.    Given that the Debtors and their advisors determined that the Closed Stores hold no material value beyond the liquidation value of inventory already sold therein, and that surrendering the Closed Stores as of the Petition Date would eliminate any potential administrative claim exposure that would otherwise arise, I believe that it was a prudent exercise of the Debtors' business judgement to issue the Surrender Letters and unequivocally surrender possession of the subject premises, including the Debtors' leasehold interests associated therewith.

114.    Additionally, the Debtors have identified certain contracts (the "**Rejected Contracts**") as contracts the Company no longer needs, as such contracts are no longer relevant to the Debtors' operations and business affairs, will not been assumed and assigned as part of any sale process, and are not otherwise beneficial to their estates.  Accordingly, the Debtors have

determined that rejecting the Rejected Contracts, effective as of the Petition Date, is an appropriate exercise of their business judgment and in the best interest of their estates to avoid potentially incurring further costs and expenses that would only undermine the Debtors' efforts to minimize costs and maximize value of the estates for the benefit of all creditors.

115.    Accordingly, for the reasons set forth herein and in the Rejection Motion, the Debtors respectfully request that the relief requested in the Rejection Motion be approved.

*[Remainder of Page Intentionally Left Blank]*

## **CONCLUSION**

116.    In sum, I am familiar with the substance contained in each First Day Pleading, and I believe that the relief sought in each First Day Pleading (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity or value, (b) constitutes a critical element in the Debtors achieving a successful and prompt resolution in these matters, and (c) best serves the Debtors' estates and their stakeholders' interests.  I have reviewed each First Day Pleading, and the facts and descriptions of the relief set forth therein are true and correct to the best of my information and belief and are incorporated herein in their entirety by reference.  If asked to testify as to the facts supporting each First Day Pleading, I would testify as to such facts.  In conclusion, for the reasons stated herein and in each First Day Pleading, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as the Court deems just and proper.

Executed: March 16, 2025                              */s/ Stephen Coulombe*

                                                Stephen Coulombe
                                                Co-Chief Restructuring Officer

**Exhibit A**

# Corporate Organization Chart



**Exhibit B**

# SPARC Organization Chart

